[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 5, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-10351

_____

BIA No. A79-344-105

LUZ MARINA SILVA,

                                                      Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                      Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(May 5, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

The main issue presented in this petition is whether evidence, viewed in the

light most favorable to the fact findings of the Immigration Judge, that two

unknown persons for unknown reasons fired shots at the car of Luz Marina Silva, a Colombian citizen, soon after she had received a single written threat about her political activity and several threatening, but not political, telephone calls, compelled the conclusion that Silva suffered past persecution or has a well-founded fear of future persecution on account of her political opinion. Silva applied for asylum and alleged that she was persecuted in Colombia by the Revolutionary Armed Forces (FARC). Because Silva's testimony at her asylum hearing failed to establish that the threats she received were more than mere harassment and she failed to establish that the shooting incident was based on her political opinion, the record does not compel the conclusion that she suffered past persecution or has a well-founded fear of future persecution. We deny Silva's petition.

## I. BACKGROUND

Silva was admitted to the United States as a nonimmigrant visitor on March 8, 2000, and was authorized to remain in the United States until March 12, 2001. One year later, just before she was scheduled to depart, Silva sought asylum. In her application for asylum and withholding of removal, filed on March 5, 2001, Silva contended that, because of her political activity, she was persecuted in Colombia by the FARC, a Marxist paramilitary group. Silva stated in her application that, while working on a political campaign in September 1999, she

2

received a written death threat that was signed by the FARC. The application stated that, after Silva received the written death threat, the FARC started calling her daily at her house and restaurant, and, on October 9, 1999, two men shot at her car while she was driving and hit the rear window. Silva's application stated that after the shooting she decided to leave the country, which she did on March 8, 2000. The application also stated that the FARC continued calling Silva daily until she left the country and that on the last call she was told that she was missed on October 9 but would not be missed again. Relevant portions of Silva's asylum application are attached as Appendix A to the dissenting opinion.

The Immigration and Naturalization Service issued Silva a notice to appear on May 30, 2001, and charged Silva with removability for remaining in the United States for a longer time than permitted. See 8 U.S.C. § 1227. Silva appeared pro se before Immigration Judge Pedro Miranda in August 2001 and was granted a continuance to obtain an attorney. On February 26, 2002, Silva again appeared pro se before Judge Miranda and admitted the facts alleged in the notice to appear. At Silva's request, Judge Miranda scheduled Silva's removal hearing for September 16, 2002, to allow Silva time to prepare her case and locate an attorney. The removal hearing was finally held on December 13, 2002. Silva appeared pro se and stated that she had been unable to secure an attorney. Silva declined another continuance and stated that she was prepared to represent herself. Silva was the

3

only witness at the hearing.

Silva testified that she had lived her entire life in Balta, Colombia, and she and her family had always been politically active. Silva testified that, although her family is known for its association with the Conservative party, she had participated in the mayoral and presidential campaigns of Antanas Mockus, a member of the Visionary party, since 1994. Silva worked for Mockus on a successful campaign for mayor of Bogotá in 1994 and an unsuccessful bid for the presidency in Colombia in 1997. Silva explained that the Visionary party drew its members from both the traditional Conservative and Liberal parties.

During Mockus's campaigns, Silva participated in "health brigades," or "help brigades," which were groups of people that traveled into neighborhoods and offered the residents of those neighborhoods health services to encourage support of the Visionary Party. Silva stated that she spoke on behalf of Mockus to people around her but never in front of an audience. Silva offered no evidence that she was threatened in any way during her work with the Mockus campaigns in 1994 and 1997.

In June 1999, Silva came to the United States on a tourist visa. She stayed for one month and then returned to Colombia. After her return to Colombia, Silva again worked for Mockus in his second successful campaign for mayor of Bogotá. In September 1999, while Silva was participating in one of the "health brigades,"

4

she was handed a "condolence note" that said "Luz Marina Silva rest in peace for doing what she shouldn't be doing in the wrong place." Silva stated that the note, which she neither reported to authorities nor kept, was signed by the FARC. Silva stated that, after she received the "condolence note," she received anonymous telephone calls. On one occasion, an anonymous caller told Silva that she was a target because her family "had always exploited the Colombian people." Another caller said Silva was a target because she, unlike other members of her family, did not have a bodyguard. Silva did not testify that any of the calls mentioned her politics.

On October 9, 1999, about three weeks after Silva received the "condolence note," two men on motorcycles followed Silva home from the restaurant she owned, and during the trip, they fired gun shots into her car. The shots hit the back window of Silva's car, but she was not injured. That night, Silva received a telephone call and the caller warned her not to report the shooting to the Colombian authorities. The caller did not identify himself.

Although Silva first speculated that the FARC was responsible for the shooting, Silva later admitted that she did not know who fired the shots or made the phone call or why the shots were fired. Silva testified that the last time she participated in politics was a few days before the October 9, 1999, shooting. Silva testified that she had no further threats, calls, or other problems after October 9,

5

1999, until she came to the United States in November 1999.

Silva stayed in the United States from November 1999 until January 2000, but did not seek asylum. Silva then chose to return to Colombia to visit a dying relative. Silva testified that she "thought enough time had elapsed and that [she] could go back, that things might be different." After her return to Colombia, Silva again began receiving anonymous telephone calls "daily," in which the callers said, in an apparent reference to the shooting of Silva's car, "we missed already once, don't provoke us again" and "we are not going to miss a second time, we're going to kill you." Silva speculated that by "provoke" the anonymous callers meant that she should not be in Colombia or return to Colombia from the United States.

Silva did not testify that any of the new anonymous telephone calls referenced her political activity, and there is no evidence that Silva engaged in any political activity in 2000. Apart from the anonymous telephone calls, Silva did not have any problems in Colombia after she returned. Silva did not report the calls in 2000 to the police. She testified that her cousin, who was secretary to Mockus, also received anonymous telephone calls and that people in all of Colombia received letters and telephone calls calculated to terrorize them. She speculated that people get letters and phone calls if "the person that's involved in some political group or is the first time doing something that they are not in – that they don't want this person to do for whatever reasons." Silva returned to the United

6

States in March 2000, about two months after she had returned to Colombia. Silva's hearing testimony is attached as Appendix B to the dissenting opinion.

In addition to Silva's oral testimony and asylum application, the record before the Immigration Judge contained Silva's written application for asylum and the 2000 Country Report on Human Rights Practices for Colombia. The Country Report noted that, in 2000, the Colombian "Government continued to face serious challenges to its control over the national territory, as longstanding and widespread internal armed conflict and rampant violence—both political and criminal—persisted." The Country Report recounted multiple stories of widespread violence and indiscriminate attacks against citizens, both military and civilian.

Also part of the record was the Colombia-Profile of Asylum Claims and Country Conditions, which states that "[t]he vast majority (perhaps as high as 90 percent) of asylum claims from Colombia are based on political grounds even in cases where there is little evidence that the political views of the applicant are related to the mistreatment alleged." The Profile states, "often applicants express uncertainty about the identity and/or motivation of their alleged abusers." The Profile concludes that "[b]ecause of the violent nature of the narcotics traffickers and guerrillas whose activities and agenda are often influenced by the availability of drug money, almost any abuse alleged by asylum applicants from Colombia

could have occurred or at least would not be inconsistent with the country conditions."

At the close of Silva's testimony, the Immigration Judge found that Silva had established neither that she had been persecuted in the past nor that she had a well-founded fear of persecution on account of a protected ground if she returned to Colombia. The Immigration Judge found that the threats Silva received could not be classified as persecution. The Immigration Judge also found that, although the shooting incident could be classified as persecution, Silva did not know who shot at her or why. The Immigration Judge recognized that conditions in Colombia were violent, but stated that "everybody in Colombia suffers under these general conditions of violence and criminal activity." The Immigration Judge did not make an adverse credibility finding. The decision of the Immigration Judge is attached as Appendix C to the dissenting opinion. Silva appealed to a three-judge panel of the Board of Immigration Appeals, which affirmed the decision of the Immigration Judge without opinion. Silva petitioned for review and is represented by counsel on appeal.

## II. STANDARD OF REVIEW

When the Board of Immigration Appeals adopts the decision of the Immigration Judge without opinion, we review the decision of the Immigration Judge. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review

8

legal issues de novo.  Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001).  This Court reviews "administrative fact findings under the highly deferential substantial evidence test."   Adefemi v. Ashcroft, 386 F.3d 1022, 1026 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. __, 125 S. Ct. 2245 (2005).  We must affirm the decision of the Immigration Judge if it is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'"  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005), superseding 378 F.3d 1260 (11th Cir. 2004) (quoting Al Najjar, 257 F.3d at 1284); Adefemi, 386 F.3d at 1027 (quoting same).  Thus, we do not engage in a de novo review of factual findings by the Immigration Judge.  Adefemi, 386 F.3d at 1027.

"[F]indings of fact made by . . . the [Immigration Judge] may be reversed by this [C]ourt only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings."  Id.; 8 U.S.C. § 1252(b)(4)(B) ("the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").  "[W]e view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision."  Id.  Under this highly deferential standard of review, we may not "'reweigh the evidence' from scratch."  Mazariegos v. Office of U.S. Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001) (quoting Lorisme v. INS, 129

F.3d 1441, 1444-45 (11th Cir. 1997)).

### III.  DISCUSSION

Silva makes three main arguments on appeal.  First, Silva argues that the evidence compels the conclusion that she suffered past persecution and, in the alternative, she had a well-founded fear of future persecution on account of her political opinion.  Second, Silva argues that she is entitled to withholding of removal because she established a clear probability that her life would be endangered if she was returned to Colombia.  Third, Silva argues that the Board of Immigration Appeals violated its regulations when it affirmed without opinion the decision of the Immigration Judge, who allegedly committed other procedural errors.  We review each argument in turn.

> *A.  Viewed in the Light Most Favorable to the Fact Findings of the Immigration Judge, the Record Does Not Compel the Conclusion That Silva Was Entitled to Asylum.*

"To establish asylum eligibility based on political opinion or any other protected ground, the alien must, with credible evidence, establish (1) past persecution on account of her political opinion or any other protected ground, or (2) a 'well-founded fear' that her political opinion or any other protected ground will cause future persecution."  Sepulveda, 401 F.3d at 1230-31.  Each avenue of asylum relief requires proof of two criteria.  To establish asylum based on past persecution, the applicant must prove (1) that she was persecuted, and (2) that the

10

persecution was on account of a protected ground. See id. To establish eligibility for asylum based on a well-founded fear of future persecution, the applicant must prove (1) a "subjectively genuine and objectively reasonable" fear of persecution, Al Najjar, 257 F.3d at 1289, that is (2) on account of a protected ground, see Sepulveda, 401 F.3d at 1230-31.

Before we review the details of the record, we must recall how our standard of review governs our reading of this record. Our task is not to determine whether the inferences Silva draws from her version of events are reasonable. We do not deny, for example, the reasonableness of Silva's contention that the written threat, the anonymous phone calls, and the shooting were all related, but that is not what we are asked to consider. Our review is more limited. The Immigration Judge found that Silva failed to prove her entitlement to asylum, and our task is to review the decision of the Immigration Judge under the highly deferential substantial evidence test: we must affirm if the decision of the Immigration Judge is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1284. With that highly deferential standard in mind, we review the evidence Silva presented in the light most favorable to the findings of the Immigration Judge.

Silva testified about four categories of events in support of her asylum application. First, Silva testified that in September 1999 she received a

"condolence note" signed by the FARC, which stated "Luz Marina Silva rest in peace for doing what she shouldn't be doing in the wrong place." Second, Silva testified that she received anonymous threatening telephone calls after receiving the "condolence note." Third, Silva testified that two men on a motorcycle shot into her car and hit the back window on October 9, 1999. She testified that she received an anonymous telephone call about the shooting that night but that she did not have any further problems until she left Colombia in November 1999. Fourth, Silva testified that, when she returned to Colombia in January 2000, she received more anonymous threatening telephone calls that referenced the shooting incident. We examine these events in turn.

We first conclude that the "condolence note" Silva received was on account of her political activity, but this one incident is not sufficient to entitle Silva to asylum. "[P]ersecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation[.]" Sepulveda, 401 F.3d at 1231 (internal quotation marks and citation omitted). The "condolence note" was an example of harassment and intimidation, but not persecution. The "condolence note" alone did not entitle Silva to asylum.

Second, Silva's testimony regarding the anonymous telephone calls she received, beginning in September 1999 until the shooting incident on October 9, 1999, does not compel the conclusion that Silva was persecuted on account of her

12

political opinion. Although the timing of the telephone calls supports an inference that the calls were related to Silva's political activity, the evidence also supports an inference that the calls were unrelated to that activity. The record reflects that the anonymous callers, whom Silva testified were "different people always," gave Silva different messages, and Silva did not testify that any of the messages referenced her political activity. Furthermore, although Silva testified that she engaged in political activity in Mockus's campaigns in 1994 and 1997, she did not testify that she was threatened in any way during her work with those campaigns and health brigades. Silva's past extensive political participation without threatening calls or other harassment, along with the lack of reference to politics in the calls in 1999, supports the inference that those calls were not about Silva's political activity. In addition, as with the "condolence note," the receipt of anonymous threats in September and October 1999, without more, does not qualify as persecution, because "[m]ere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (quoting Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir.2000)).

Third, we assume, for the sake of argument, as the Immigration Judge did, that the shooting would qualify as persecution, but Silva's evidence does not compel the conclusion that the shooting was connected to her political activity. Silva testified that she did not know who shot at her car or why. The Immigration

13

Judge reasonably took that candid and powerful admission at its face value.

Again, although the timing of the shooting would allow an inference that it was related to the "condolence note," the record does not compel that conclusion. Substantial evidence also allows an inference, as the Immigration Judge found, that the shooting incident, for which Silva had no explanation, did not distinguish her from the majority of Colombians who are also subject to the general conditions of violence and criminal activity in Colombia. Both the Colombian Country Report and the Country Profile are replete with descriptions of widespread and indiscriminate violence. Silva testified that some of the anonymous calls before the shooting were about her family exploiting the Colombian people and her not having a bodyguard, that she did not know who shot at her or why, and that Colombians routinely suffer similar incidents of terroristic threats and violence. We are required to view all of this evidence in the light most favorable to the findings of the Immigration Judge, Adefemi, 386 F.3d at 1027, and in that light, we cannot say the shooting was indisputably related to Silva's political activity.

Silva testified credibly about these events, but it is not clear from the record that even Silva believed, at the time of the shooting, that it was related to her political activity. After the shooting, Silva remained in Colombia for almost a month and a half with no further difficulties. Silva came to the United States on November 21, 1999, and stayed to January 2000 but did not seek asylum. Silva

14

then returned to Colombia for a few months before returning to the United States in March 2000. Even then, Silva did not seek asylum until a year later. We do not doubt Silva's sincerity in applying for asylum in March 2001, but her actions in 1999 and 2000 do not comport with the actions of an individual who believed at that time that she was a target of political persecution. It is reasonable to infer from Silva's actions that the allegedly "compelling" connection between the shooting and her political activity was not immediately apparent even to Silva.

The final events about which Silva testified involve the anonymous telephone calls from January to March 2000, but Silva's testimony about these calls did not establish that they were about her political opinion or anything more than harassment. Silva testified that the anonymous callers referenced the October shooting incident, but she did not testify that any of the callers mentioned politics. Silva also acknowledged that she had not participated in any political activity since before the shooting and that she did not report any of the calls to the police. Apart from the telephone calls, Silva did not have any other problems in 2000.

Although Silva's testimony does not compel the conclusion that the anonymous calls in 2000 were on account of her political opinion, the timing and substance of those calls do support an inference that the earlier shooting was not about Silva's political activity. Silva received the calls even though she had not been involved in politics for at least three months. The calls referenced the

15

shooting incident, but Silva offered no evidence that any of the calls referenced politics. The references to the shooting incident, without any mention of Silva's political activity, which had ended several months earlier, suggest that the shooting incident was unrelated to Silva's political activity. This inference is also supported by the fact that, in 1994 and 1997, when she participated in the Mockus campaigns and health brigades, Silva received no telephone calls, but from January to March 2000, when she was not participating in any political activity, Silva received calls that did not mention her political activity.

In sum, when we view the evidence in the light most favorable to the finding of the Immigration Judge, the record does not compel the conclusion that Silva suffered political persecution. Silva's testimony compels the conclusion that the "condolence note" was on account of her political opinion, but this event does not qualify as persecution. Sepulveda, 401 F.3d at 1231. Although we assume, for the sake of argument, that the shooting incident qualifies as persecution, apart from closeness in time, Silva did not offer any evidence to connect the shooting with the "condolence note" or her political activity in general. The record does not compel the conclusion that the shooting was on account of her political activity. Similarly, the record does not compel the conclusion that the harassing, anonymous telephone calls Silva received were on account of her political opinion.

Silva also failed to establish a well-founded fear of future persecution if she

16

returned to Colombia. Silva failed to establish that she will be singled out on account of her political opinion or the opinions of her family. Because the record does not compel the conclusion that the past treatment to which Silva was subjected was on account of her political opinion, Silva's subjective fear of future persecution is not objectively well-founded.

Our decision in Sepulveda, where the asylum applicant allegedly feared persecution at the hands of the other main Colombian guerilla group, ELN, is instructive. Sepulveda "participated in approximately ten peace marches" and personally assisted in hostage negotiations "between the kidnapers and the hostages' families." Sepulveda, 401 F.3d at 1229. We concluded that evidence of specific threats against Sepulveda, delivered both by telephone and to her family members, as well as a bombing of the restaurant where Sepulveda worked, did not require that we grant her petition for review. As to the bombing incident, we explained, "Although the evidence may permit a conclusion the restaurant bombing was directed at Sepulveda on account of her political activity, it does not compel such a conclusion." Id. at 1231. We also ruled that "the menacing telephone calls and threats to her, her brother, and other members of the university group do not rise to the level of past persecution that would compel reversal of the IJ's decision." Id. The Sepulveda decision illustrates that only in a rare case does the record compel the conclusion that an applicant for asylum suffered past

17

persecution or has a well-founded fear of future persecution. Silva's petition does not present that rare case.

The dissent accuses the majority of deconstructing the evidence to reach its decision, but the dissent uses a vivid imagination to draw inferences in favor of Silva and ignore competing inferences that favor the findings of the Immigration Judge, contrary to our deferential standard of review. Because imaginative inferences are all that support its opinion, the dissent is left in the position of one who, trying to fill a leaky bucket with water, must first plug all the holes. Silva's testimony is full of holes, and the dissent impermissibly draws inferences in Silva's favor to plug those holes.

The prime example of the dissent drawing an inference in favor of Silva that is not compelled by the record is the inference of a connection between the condolence note, the shooting, and anonymous telephone calls. Silva admitted she did not know the identity or motivation of the shooters, and the Country Reports and Profile established that random threats and acts of violence are common in Colombia without regard to the victim's political opinion. Silva also had been involved in politics for several years without receiving any threats. Silva did not testify that any of the anonymous calls she received in 1999 and 2000 mentioned her politics, and the calls in 2000 were received several months after Silva ended her political activity. There was a connection between the anonymous calls and the

18

shooting, but neither the calls nor the shooting were necessarily related to Silva's politics. Although the Immigration Judge, in the absence of direct evidence of the reasons for the shooting, plausibly inferred that the shooting may not have been based on Silva's political opinion, the dissent draws the opposite inference in favor of Silva.

Another problem with the inferences drawn by the dissent is that they are based invariably on Silva's ambiguous application for asylum rather than her specific testimony at her hearing in response to questions asked by the Immigration Judge. Although Silva's testimony was consistent with her asylum application, her testimony added context and greater detail to the cursory facts alleged in her application, and her testimony exposed substantial deficiencies in her claim to asylum.

Silva's petition presents an atypical contrast between a written application for asylum and later testimony by the applicant at a hearing. Often an applicant for asylum will fail to allege in his written application specific and credible facts to support an inference of persecution, but when that applicant later testifies, at a hearing before an immigration judge, the applicant will allege facts that, if true, compel an inference of persecution. In many cases, the Immigration Judge will find that the applicant's testimony is incredible, and the Immigration Judge will base that adverse credibility determination on the inconsistencies between the

19

earlier written application and the applicant's later testimony. See, e.g., Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1285 (11th Cir. 2005); D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004). Silva, in contrast, wrote allegations in her application for asylum that, without more, supported an inference of persecution on account of her political opinion, but when Silva later testified credibly and in greater detail about those facts, at her asylum hearing, she provided ample grounds for finding that she had not suffered persecution based on her political opinion.

A good example of the contrast between Silva's conclusory written application and her later and more specific testimony involved the identity of her persecutors. Silva's written application stated, without qualification, that the FARC called her and tried to kill her, but when asked about those facts at her hearing, Silva admitted that she did not know who was responsible for the telephone calls or the shooting:

    Q. Who were these two people, do you know?
    A. No.
    Q. Why did they shoot you, shoot at you, do you know?
    A. I have no idea but days before I was receiving – they were calling
    me anonymous phone calls.

Another example of this contrast involves Silva's account of the timeline of events and her travel to the United States. Silva's application did not mention her trip to the United States in November 1999 or that the threatening telephone calls

20

ceased for almost a month and a half before she left Colombia in 1999, but at her hearing Silva testified that she came to the United States on November 21, 1999, and returned to Colombia in January 2000. She also testified that she had no further problems after the shooting before she came to the United States in November:

> Q. So what you did was you came to the United States the next month?
> A. Yes, in November.
> Q. Between that – up to November of 1999 had you had any other problems?
> A. No, no, no.

A third example of the contrast between Silva's speculative application and later testimony involves the contents of the telephone calls she received. Silva stated in her application that the FARC called her and wanted her to stop her visits to the poor neighborhoods, but when she was given the opportunity at her hearing to describe the telephone calls Silva's details did not support an inference of political persecution. Silva testified that she did not know who the callers were. Silva also described specific statements in the telephone calls about the wealth of her family, the shooting incident, and the absence of a bodyguard for her, but Silva never mentioned that any of the anonymous telephone calls, either before or after the shooting, referenced her political activity.

In the light of the gaps in Silva's testimony and her evident lack of

21

knowledge regarding either the alleged persecutors or the reason why she was allegedly persecuted, the dissent relies on conclusory statements in Silva's asylum application rather than her more specific testimony to bolster its opinion. Although Silva's testified at her hearing about the content of the telephone calls, but did not mention politics, the dissent, for example, quotes from Silva's asylum application in which she asserted that the callers wanted her to "stop with my visits to these neighborhoods." The dissent uses that assertion about the presumed intent of the callers, which Silva did not mention at her hearing, to supply an inference that the telephone calls were expressly related to Silva's political activity.

Another example of the dissent's generous use of Silva's conclusory application rather than her specific testimony involves the timeline of events. Although Silva testified at her hearing that she had no problems after the day of the shooting and came to the United States over one month later, the dissent asserts that Silva "immediately began preparations to flee and actually left for the United States on November 21, 1999." Dis. Op. at 37. The basis for this inference in favor of Silva is apparently a statement in Silva's asylum application, in which she stated, in reference to the shooting, "From that moment on, I stopped all my activities and decided to leave the country which I did on March 8, [20]00." This imagined version of events creates an inference of urgency that does not exist in Silva's more specific testimony.

22

The dissent also reads the record in the light most favorable to Silva when it infers that the anonymous calls in January to March 2000 were related to political activity. Silva testified that the callers in January to March 2000 referenced the shooting, but she did not, even when asked what the callers said, testify that any caller mentioned her politics:

Q.    So you returned to Bogota when, in January of 2000?
A.    Yes.
Q.    Okay, and did you have any further problems after you returned to Bogota?
A.    Yes.
Q.    What happened?
A.    I began to receive once again telephone calls from the urban group.
Q.    Before the calls previous had been anonymous. Were these calls identified?
A.    No. The same way, anonymous.
Q.    What did they say?
A.    We missed already once, don't provoke us again. We missed on the 9th, we are not going to miss a second time, we're going to kill you. A very rude, very obscene.

Although there is no evidence that these calls in 2000 were related either to Silva's politics, or the "condolence note," or even the calls that preceded the shooting, the dissent draws an allegedly compelling inference in favor of Silva and treats the calls and these other events as unquestionably interrelated. Dis. Op. at 36. The failure of the dissent to draw the reasonable inference, in favor of the finding of the Immigration Judge, that these events, in a country besieged by indiscriminate violence, intimidation, and crime, could be unrelated, is telling.

23

Finally, the dissent takes issue with the reliance by the majority and the Immigration Judge on the Colombian Country Report and Country Profile. The dissent argues that the majority fails to recognize "that the Country Profile indicates that much of the violence in Columbia is targeted at activities that are protected grounds." Dis. Op. at 39. The dissent quotes the Country Profile that "[F]our out of every ten murders are targeted for their involvement with political, labor, or social causes." Id.

Again the dissent reads the record in the light most favorable to Silva. We agree that Colombia is a place where the awful is ordinary, but we must state the obvious: if four out of every ten murders are on account of a protected ground, six out of ten are not. The majority of the violence in Colombia is not related to protected activity. When an individual seeking asylum based on persecution does not know either the identity of the alleged persecutors or the reason for the persecution, the prevalence of random violent activity in Colombia, totally unrelated to any protected ground, allows a reasonable inference that the individual seeking asylum is the victim, not of political persecution, but of random violence. When we read the Colombian reports in the light most favorable to the finding of the Immigration Judge, as we must, the substantial evidence of non-political violent activity in Colombia supports the conclusion that Silva's evidence, with its gaping holes and absence of proof, did not establish persecution on account of a

24

protected ground.

Regarding our reference to our precedent in <u>Sepulveda</u>, the dissent wonders whether the petition of a successful applicant for asylum in our Court is like the fabled unicorn, but the dissent, as with its view of the evidence, misses the point about the scope of our review. It is a rare case that will compel reversal of the Immigration Judge for one fundamental reason: the Immigration Judge is in a superior position to make findings of fact. We do not reweigh the evidence presented to an Immigration Judge for sound reasons. Immigration Judges, not we, actually see and hear the applicants for asylum testify. Immigration Judges, not we, have personal encounters with applicants for asylum from Colombia who, like thousands of other Colombians, suffer real threats of violence. Immigration Judges, not we, are on the front lines everyday deciding whether the persecution suffered by an applicant for asylum meets the requirement of Congress that it be based on a protected ground. Our standard of review reflects the wisdom that Immigration Judges are in a better position to make that judgment call.

Although the law recognizes that the Immigration Judge who saw and heard Silva testify was in a superior position to make findings of fact, the dissent is able to find, in its search of the cold record before us, several facts that are not clear to us. First, the dissent finds the identity of the shooters even though Silva testified that she did not know them. Second, the dissent finds the motivation of the

25

shooters even though Silva testified that she did not know their motivation. Third, the dissent finds the identify of the telephone callers that Silva described as anonymous. Fourth, the dissent finds that the calls were about Silva's politics even though Silva did not describe a single reference to her political activities in the calls. Fifth, the dissent finds that the events involving a written threat, anonymous calls, and unknown shooters were all interrelated in a country where indiscriminate threats, crime, and violence are commonplace.

Whether we, like the dissent, would have made different findings, if faced with Silva's application for asylum and live testimony, is irrelevant. When we view the record in the light most favorable to the Immigration Judge, we conclude that the denial of Silva's application was supported by substantial evidence. We reject Silva's petition for review of the denial of her application for asylum.

### B. The Record Does Not Compel the Conclusion That Silva Was Entitled to Withholding of Removal.

To qualify for withholding of removal, Silva must have established that it is more likely than not that her life or freedom would be threatened on account of a statutorily protected factor if returned to Colombia. 8 U.S.C. § 1231(b)(3). "Where an applicant is unable to meet the 'well-founded fear' standard for asylum, [s]he is generally precluded from qualifying for either asylum or withholding of [removal]." Al Najjar, 257 F.3d at 1292-93 (citations omitted). Because Silva

26

failed to establish eligibility for asylum, she likewise failed to establish entitlement to withholding of removal.

### C. *The Board of Immigration Appeals Obeyed Its Regulations When It Affirmed Without Opinion.*

Silva's final arguments relate to alleged procedural errors of the Immigration Judge and Board of Immigration Appeals. We defer to the interpretation of the regulations that governs the Board of Immigration Appeals if the interpretation by the Board is reasonable and does not contradict the clear intent of Congress. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82 (1984). If the decision of the Immigration Judge complies with the regulations, the issues in the case are not complex, and the issues are governed by existing precedent, then it is proper for the Board to affirm the decision of the Immigration Judge without opinion. Gonzalez-Oropeza v. United States Att'y Gen., 321 F.3d 1331, 1333 (11th Cir. 2003); see 8 C.F.R. § 1003.1(e)(4)(i).

Silva complains that the Board of Immigration Appeals affirmed without opinion, and the Immigration Judge failed to satisfy the standards of the Board for a reasoned decision, but these arguments fail. Nothing in this case required a written opinion by the Board of Immigration Appeals. The Immigration Judge did not commit material errors, and the clear issues presented by this case were

27

governed by our previous decisions in <u>Adefemi</u> and <u>Sepulveda</u>.

## IV. CONCLUSION

We deny Silva's petition for review of the order for her removal.

**PETITION DENIED.**

CARNES, Circuit Judge, dissenting:

I dissent from the decision to deny Ms. Silva's petition for review of the order of removal, which is based on the denial of her application for asylum.

**I.**

The question is not whether the immigration judge should have found the statements Silva made in her asylum application and hearing testimony to be credible. The judge did credit her statements. Because he did, the law requires that we, too, accept Silva's statements as truth. Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005); Vasquez-Mondragon v. INS, 560 F.2d 1225, 1226 (5th Cir. 1977). In reviewing a denial of asylum where the immigration judge credited the applicant, we are to take as true not only the statements she made during her testimony but also those contained in her application, at least where the two are consistent. See Nreka v. U.S. Att'y Gen., 408 F.3d 1361, 1364 (11th Cir. 2005) (considering "his application for asylum and his testimony"); Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1229–30 (11th Cir. 2005) (examining both "Sepulveda's testimony and her asylum application" and stating standard of review in terms of "the record considered as a whole"). And, as the majority concedes, "Silva's testimony was consistent with her asylum application." Maj. Op. at 19.

Silva said in her application that after FARC sent her the threatening note, she received almost daily threatening phone calls from FARC which continued

29

until she left the country. She also stated that: "I was threatened to death by the FARC's urban militias"; FARC "declared me a military objective"; "If I go back to Colombia . . . [I will be] tortured and killed"; "I would be killed as FARC sentenced me"; and "I know that if I go back to my country I will be kill [sic]." She explained that if she went back FARC "will find me sooner or later, to be tortured and killed and FARC always does." These application statements are consistent with her testimony. That should be all we need to know. See Menghesha v. Gonzales, 440 F.3d 201, 203 (4th Cir. 2006) (reciting the "undisputed facts adduced in [the] asylum application and hearing testimony" and stating "[i]n the absence of contrary evidence or an adverse credibility determination, we accept [the] uncontested account as true.").

The majority's attempt to dismiss Silva's asylum application as "ambiguous" compared to "her specific testimony" at the hearing is unconvincing. In fact, Silva's application is as specific and detailed, if not more so, than her testimony. Her application actually contains more words than her testimony, and the bulk of what she said in her application is a lengthy and detailed explanation of the events preceding and following FARC's attempt on her life. It is not ambiguous. Silva pointedly states that FARC tried to kill her and will kill her if she is forced to return to Colombia. To avoid a battle of scissors and trading snippets of Silva's statements and testimony with the majority, I have attached as

30

appendices to this opinion every part of her application where she made any statement about the facts (App. A), her entire testimony (App. B), and the immigration judge's ruling (App. C). The interested reader can see for herself everything that Silva said and the context in which she said it.

In reading Silva's testimony at the hearing we should keep in mind that there she only answered questions asked by the immigration judge—who expressed his skepticism of all asylum claims relating to Colombia—and by the attorney representing the Immigration and Naturalization Service. Silva had no attorney, spoke through an interpreter, and did not attempt to question herself. As a lay person, Silva may well have believed that the statements in her application entitled her to asylum. It is difficult for me to view that as an unreasonable belief, especially since it is one that I share. Again, the majority's insistence that Silva's testimony was more specific and detailed than her statements in her application is simply not accurate. Compare App. A (the asylum application) to App. B (the testimony).

While purporting to accept Silva's credited statements as true, the majority actually does an end run around the credibility determination by selectively dismissing her statements that discomfort its position, labeling them as "speculative," or suggesting that maybe Silva was not credible after all. For example, the majority more than once implies that maybe Silva should not be

believed because she did not report to the police the threatening phone calls she received. Silva explained that she did not report them because she had been warned: "don't you dare even think about making a report," and that people in Colombia are too afraid to make police reports. In any event, her failure to report the threats and violence against her did not prevent the immigration judge from crediting her statements about what happened. While purporting not to reweigh the evidence, the majority actually does so by disregarding as not specific and not credible enough many of the statements that Silva made in her application and some of those she made while testifying at the hearing. Either Silva was credible, or she was not, and the immigration judge found her to be credible. We must take her statements, those in the asylum application as well as those she made while testifying, to be true.

Having determined that Silva was credible, the question before the immigration judge was whether the historical facts established by Silva's application and testimony proved that she had suffered "persecution or a well-founded fear of persecution on account of . . . [her] political opinion" within the meaning of § 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A). Our standard of review requires that we apply a substantial evidence test to determine if the immigration judge's decision is supported by "reasonable, substantial, and probative evidence on the record considered as a

whole." Sepulveda, 401 F.3d at 1230; Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). If not, then the evidence would "compel" a reasonable factfinder to conclude otherwise than the immigration judge did, and we must reverse. Sepulveda, 401 F.3d at 1230. Because the standard of review in these cases is deferential, we have been loath to find that a petitioner has met her burden on appeal. This, however, is a case in which we should find she has done so.

## II.

The facts established by Silva's statements are these. Three weeks before she was shot at, Silva received a threatening "condolence note" from FARC. As the majority opinion recognizes, this threat was made solely because of Silva's political activities in the countryside on behalf of the Visionary Party. The only fair interpretation of the "Rest in Peace" condolence note she was handed, while engaging in political activities, is that FARC was threatening to kill Silva because of those political activities.

Three weeks after FARC threatened to kill her for that reason, someone tried to carry out that threat. On October 9, 1999, while Silva was driving between the restaurant her family ran and her apartment, two gunmen on a motorcycle shot at her. The bullets shattered a window of her car, as Silva put it: "missing me by very little." Shying away from the obvious, the majority opinion is willing only to assume that being shot at is persecution. I would be so bold as to hold that it is,

33

especially when the attempted murder is preceded by a written threat to kill the victim because of her political activities and by an almost daily barrage of threatening phone calls at her home and restaurant.

The element the immigration judge found wanting, and the majority opinion concludes is not compelled by Silva's statements and testimony, is that the shooting on October 9, 1999, and the threatening phone calls she received were on account of her political activities. The immigration judge and the majority are wrong. Not only did the shooting come only three weeks after FARC threatened to kill Silva because of her political involvement, it also came after she refused to stop her political activities despite the FARC threat. As Silva put it in her asylum application, after the threatening note, "I got scared but promise myself not to let these subversive [sic] intimidate me and continued with my political and social involvement." She had last been involved in political activities just a few days before the attempt to kill her. In other words, FARC threatened Silva with death because of her political activities, she refused to give in to the threat and continued to engage in political activities, and promptly thereafter someone did try to kill her, just as FARC had promised it would.

Attempting to denigrate the compelling force of these facts, the majority opinion insists that the "connection between the shooting and her political activity was not immediately apparent even to Silva." Maj. Op. at 15. According to

34

Silva's credited testimony: "I had an attempt against my life, the FARC tried to kill me before I came over here." That is why she sought asylum. During the hearing Silva was asked this about the shooters: "Who were these two people, do you know?" and she answered "No." The majority views that admission as of great significance, stressing that, "she did not know who fired the shots or made the phone call or why the shots were fired." Maj. Op. at 5. True enough, the would-be assassins did not stop to introduce themselves. They rarely do. It is not realistic to expect the targets of political assassinations to know the identity of the gunmen who shoot at them. Only in the majority's imagination do would-be killers wear name tags or drive around on motorcycles with vanity plates displaying the name of their terrorist organization. While Silva did not know the identity of the two people who shot at her, she testified that the shooting came only three weeks after FARC had made a written threat against her life because of her political activities. She also testified at the hearing that "FARC tried to kill me before I came over here."

Contrary to the majority's repeated contention that the phone calls were "threatening, but not political," Silva stated that the anonymous callers wanted her to stop her trips to the neighborhoods where she had engaged in political activities and that they knew her family's political participation. She testified at the hearing that the calls were "from the urban group," an obvious reference to FARC. She

35

also linked the attempted murder to her political activities. When asked why the men had shot at her, Silva testified that while she did not know, days before the attempt to kill her she had received the anonymous phone calls and only three weeks before she had received the condolence note from FARC while engaged in political activities.  That was entirely consistent with her statements in the asylum application that FARC wanted her dead and would kill her if she returned to Colombia.   The evidence compels the conclusion that Silva did believe, and with good reason, that FARC tried to kill her.

FARC's threat to kill Silva and the attempt that was made to do so are linked not only by closeness in time but also by the stream of anonymous, threatening phone calls Silva began receiving immediately after she was handed the condolence note from FARC.  Describing the timing and content of those calls, Silva referred to the day she received that note from FARC and said:

> From that moment on the phone calls from FARC started almost daily at my house and at my restaurant "Tomillo Laurel y Pimienta."  They were wanting me to stop with my visits to these neighborhoods and to my surprise they also knew all my family background and my family political participation.  They mentioned that to kill me was a nice way to take revenge of my all my [sic] political relatives that were taking advantage of the Colombians who did not know the evil underneath my family that we were on[ly] looking for our welfare not for the welfare of the working class.

In response to the shooting, Silva stopped her political activities, and the

36

threatening phone calls ceased. She immediately began preparations to flee and actually left for the United States on November 21, 1999. When Silva returned to Colombia in January of 2000 to visit a gravely ill relative, the threatening phone calls resumed, and they came on a daily basis. They continued until Silva left for the United States a second time two months later, and she has not been back to Colombia since.

The gist of the threatening phone calls was: "We missed already once, don't provoke us again. We missed on the 9th, we are not going to miss a second time, we're going to kill you." In one or more of the phone calls she received Silva was told that her family had always exploited the Colombian people and the violence had been directed at her because, unlike other members of her family, Silva did not have bodyguards. Silva testified that her family on her father's side always had been involved in politics. She explained that by "family" she "meant uncles, cousins, my father's cousins. My father's side of the family."

Unlike Silva, none of her four brothers had ever been involved in any type of politics. They lived in a house with Silva's mother. None of the four non-political brothers (or the mother apparently) ever had any problems with FARC. The restaurant the family owned and ran never had any problems with FARC. The only person in Silva's immediate family to get a death threat from FARC, to get shot at, and to be tormented daily by threatening phone calls was the politically

active Silva, who had received a threatening note from FARC because of her political activities.

When asked if her cousin, the Mayor of Bogota's secretary, had any problems, Silva testified: "They have always received anonymous phone calls, always. In Bogota in the whole Colombia they are always calling and sending letters to terrorize people." Silva pointed out that the violence and threats of violence usually were targeted at those engaged in political activities. When asked if a lot of people get letters and phone calls, she explained: "Yes. If the person that's involved in some political group or is the first time doing something that they are not in–that they don't want this person to do for whatever reasons."

In determining whether the facts and circumstances in any case compel a conclusion, we ought to face up to the full force of them in their entirety. The majority's approach, instead, is a virtuoso exercise in deconstructionism. It proceeds by disassembling the whole of the evidence and then explaining why each part by itself is insufficiently compelling. This is like a man who attempts to demonstrate that a bucket of water is not really that by emptying it cup by cup, asserting as he goes along that each cupful is not a full bucket's worth until, having emptied the whole, he proclaims that there just wasn't a bucket of water there.

The only reasonable conclusion from the facts established by Silva's application statements and testimony, which were credited by the immigration

38

judge, is that the reason she was threatened, shot at, and threatened again is her political activities.  The evidence compels that conclusion.  It is no answer to say to Silva, as the immigration judge did, that "I don't see that you are in any worse position than anybody else in that country."  I doubt that all forty-three million people in Colombia are being persecuted by FARC—the evidence establishes that at least four of them, Silva's non-political brothers, are not.  In any event, the widespread nature of violence in a country is not a legitimate reason for denying asylum to a petitioner who establishes that she has been persecuted within the meaning of § 101(a)(42)(A) of the Immigration and Nationality Act.  There is no numerosity exception in the asylum laws.

The majority opinion seems to endorse the immigration judge's widespread terror exception to the asylum laws, finding comfort in the Colombian Country Report and the Country Profile's being, in the majority's words, "replete with descriptions of widespread and indiscriminate violence."  Maj. Op. at 12.  What the majority and the immigration judge fail to recognize is that the Country Profile indicates that much of the violence in Columbia is targeted at activities that are protected grounds under the asylum laws of this country.  See Dep't of State Bureau of Democracy, Human Rights and Labor, Colombia Profile of Asylum Claims & Country Conditions 3 (1997)  ("[F]our out of every ten murders are targeted for their involvement with political, labor, or social causes.").  The fact

39

that there is also indiscriminate violence is no reason for refusing to recognize violence and persecution on grounds that are specifically listed in our immigration laws. Otherwise, no one from Colombia would ever be eligible for asylum.

And indeed under the majority's decision, no one from Colombia will be entitled to asylum. Since "[t]he majority of the violence in Colombia is not related to protected activity," since the "awful is ordinary," and since only "four out of every ten murders are on account of a protected ground," Maj. Op. at 24, it will always be reasonable to find that violence was not on account of a protected ground—even where, as here, a terrorist group threatens a political activist with death because of her politics, she receives a barrage of threatening phone calls connected in time to that threat and to her political activities, and soon thereafter someone attempts to kill her. This is not a good decision but there is, I suppose, a bright side. What the Court holds today will make it easier to handle our caseload. In the future we can simply stamp any petition for review of a Colombian's asylum denial: "Affirmed. See the Silva decision."

Today's decision also has implications beyond cases involving Colombian applicants. The majority opinion refers to the often-mentioned, but never sighted, "rare case" in which the facts are so compelling that we will reverse an immigration judge's finding that a petitioner has failed to prove persecution on a protected ground. No published opinion of this Court has ever found that rare

case, and today's decision indicates that such a case, like the fabled unicorn, exists only in our imagination.

APPLICATION FOR ASYLUM OR WITHHOLDING OF REMOVAL

. . . .

PART C.  INFORMATION ABOUT YOUR CLAIM TO ASYLUM

. . . .

1.     Why are you seeking asylum?  Explain in detail what the basis is for your
claim.

I am seeking political asylum in the United States, because my life is at risk
in my country Colombia because of death treats by F.A.R.C.

I come from a family traditionally linked to the Conservative Party and very
involved in politics.  For our family it was very natural to actively participate with
our party on different campaigns and on different positions in the government.  On
question no.     I mentioned some of the names of my closed relatives that have
had important political positions in my country.  In 1994 I became involved with
the Movimiento Civico Independiente Visionario, but for the mayoral position
only, and this is because of the person who was running for this position.

I am very closed to my cousin Alicia Eugenia Silva, current general
secretary of the Mayoralty in Bogota.  Presided by Mayor Mockus.  Together we
participated on Mayor Mockuses political campaign.  We believed on him even
though he does not belong to the Conservative Party.  He is from the "Partido
Civico Independiente" party, so anyone from any of the two traditional parties can
vote for him.  This is his second period as Bogota's mayor, he was the Mayor of
Bogota in 1994.  He resigned from his first period in order to postulate himself for
the Presidency in 1997, for the 1998 presidential elections.  He lost the
presidential elections but run for the mayoralty campaign, and was elected as
Mayor again, on October 2000.

I worked very hard on both of Mayor's Mockus campaigns because he is a
very honest and hard working man, who is wanting to take the challenge of being
the mayor of one of the most dangerous capitals of the world and works very hard
to change and improve its image, even though I believe now that it is very difficult
if not impossible, given the overwhelmed internal violence of my country.

APPENDIX A

I worked very actively for the 1994 mayor's campaign, which fortunately we won. I started working for Antanas Mockus again in 1997 when he was running for President, which after a lot of efforts and worked, he lost. In August of 1999, after I came back from the United States I got involved again for his new postulation as mayor. I worked very actively in August, September and October when I had to leave the country because of the death threats against my life.

I began my political participation on this last campaign in August of 1999, afer I went back to Bogota from my trip to the United States. I began working for the mayoralty campaign. I used to go to the party's meeting at the headquarters every week, where we planned the different strategies that we were going to follow in order to pursue our goals. In there, we also organized the health campaigns that were going to take place in the different marginal neighborhoods. I also did this campaigns when I worked for the Conservative Party, and was aware of its procedures. Through these campaigns we helped the people and at the same time we got new adepts for the party.

My problems started around the third week of September of 1999, while I was in the "Santa Fe" neighborhood talking to the people about getting an education to get ahead in life and in order to help Colombia to overcome the difficult situation that it is currently involved in. After I finished talking a lady came to me and handed me an envelope which I kept in my pocket and thanked the lady. That evening in my house when I opened the envelope I realized that it was a suffrage with my name on it and the words: May Luz Marina Silva rest in peace, because she was doing what she was not suppose to in the wrong neighborhood. It was signed by FARC. Known the country's situation, I got scared but promise myself not to let these subversive intimidate me and continued with my political and social involvement.

From that moment on the phone calls from FARC started almost daily at my house and at my restaurant "Tomillo Laurel y Pimienta", they were wanting me to stop with my visits to these neighborhoods and to my surprise they also knew all my family background and my family political participation. They mentioned that to kill me was a nice way to take revenge of my all my political relatives that were taking advantage of the Colombians who did not know the evil underneath my family that we were on looking for our welfare not for the welfare of the working class.

2

On October 9, 1999, (a day that I will never forget). When I was going back home from my restaurant, in my car I was followed by 2 men on a motorcycle, that shoot at my car hitting the left rear window, missing me by very little. I accelerated and I don't even know how I got home. From that moment on, I stopped all my activities and decided to leave the country which I did on March 8, 00, very sad and upset because I don't know when I will be able to see my family and go back to my country.

FARC continued calling me at my house until the same day that I left the country. On the last call, I was told that I was missed on October 9, but that it was not going to happen again. For all these reasons I am seeking political asylum in this country. I know that if I go back to my country I will be kill.

2.  Have you or any member of your family ever belonged to or been associated with any organization or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

Yes.

. . . .

Traditionally, I and the rest of my family are of the Colombia Conservative Party.

To the Colombian Chamber of Commerce.

Alfonso Valdivieso, former Secretary of Justice in Colombia (Conservative Party). Cousin. He now is the Colombian Ambassador at the United Nations.

Humberto Silva Valdivieso, Governor of Santander, Colombia and Ambassador in Montevideo, Uruguay. Uncle.

Enrique Silva Valdivieso, Councilman of the Republic, in Bogota, Colombia. Uncle.

Alicia Eugenia Silva, Cousin, Former Secretary of Government, and current General Secretary to the Mayoralty with Mayor Mockus.

3.　　Have you or any member of your family ever been mistreated or threatened by the authorities of your home country or any other county or by a group or groups that are controlled by the government, or that the government of the country is unable or unwilling to control?

Yes.

If YES, was it because of . . . [Yes] Political Opinion?

. . . .

I was threatened to death by the FARC's urban militias. Because of my family background and my political participation, many in my family have been threatened to death by the guerrilla but most of them are protected by bodyguards.

4.　　Have you or any member of your family ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in your country or any other country, including the United States?

No.

. . . .

5.　　Do you fear being subjected to torture (severe physical or mental pain or suffering, including rape or other sexual abuse) in your home country or any other country if you return?

Yes.

I was already phychologically tortured by FARC when I found out that they declared me a military objective, I was shot at on October 9, 1999. I know that if

I go back to Colombia the psychological torture will start all over again, knowing that they will find me sooner or later, to be tortured and killed and FARC always does.

See Addendum. [Response to Question 1]

6.     What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution? Explain in detail and provide information or documentation to support your statement, if available.

I would be killed as FARC sentenced me.

See Addendum. [Response to Question 1]

7.     Describe in detail your trip to the United States from your home country. After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?

No.

. . . .




## U.S. Department of Justice
### Executive Office for Immigration Review
### United States Immigration Court

Matter of

File 79 344 105

LUZ MARINA SILVA

)
)
)   In REMOVAL Proceedings
)
)
Respondent   )   Transcript of Hearing

Before PEDRO MIRANDA, Immigration Judge

Date:   December 13, 2002          Place:   Miami, Florida

Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland

Official Interpreter:   Lanell Haza

Language:   Spanish

Appearances:

For the Immigration and
Naturalization Service:          For the Respondent:

Gail Schwartz                    Pro se

## APPENDIX B

JUDGE FOR THE RECORD

December 13, 2002, Miami, Florida. I am Judge Pedro Miranda. These are removal proceedings in the case of Luz Marina Silva, 79 344 105. Present is the respondent, pro se; the Service represented by trial attorney Gail Schwartz (phonetic sp.) in the proceedings in the Spanish language through Court interpreter Ms. Lanell Haza (phonetic sp.). We're here for a hearing in the respondent's application for asylum withholding of removal, relief under the torture convention.

JUDGE TO MS. SILVA

Ma'am, we're here today for a hearing on your asylum case, are you ready to proceed?

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

Did you try to get an attorney, ma'am?

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

Do you have an attorney?

MS. SILVA TO JUDGE

No.

JUDGE TO MS. SILVA

Why not?

MS. SILVA TO JUDGE

000267

 

I contacted several of the attorneys around the list, the Service's list, and they couldn't take my case because they were too busy. Then I contacted other attorneys and these attorneys were charging me too much money. I have here a copy of the letters from the people who sent me answers about my request. I don't know if you need to see that.

JUDGE TO MS. SILVA

Well, I don't need to see them, you have a right to an attorney, I can't give you one. I can only give you time to get one if you want. If, you know, but if you don't have an attorney then you will have to represent yourself. What do you want to do? Are you ready to represent yourself today?

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

Okay, so you don't want to get an attorney?

MS. SILVA TO JUDGE

No.

JUDGE TO MS. SILVA

Okay. Please stand and raise your right hand. Do you swear to tell the truth, the whole truth, and nothing but the truth, so help you God?

MS. SILVA TO JUDGE

Yes, I swear.

JUDGE TO MS. SILVA

000268



Sit down.  Now, I told you at previous hearings that if you represented yourself you have the right to present witnesses and documents in your case.  Do you have any documents that you want the Court to look at?

MS. SILVA TO JUDGE

No.

JUDGE TO MS. SILVA

Okay.  You can sit right there and testify from there, all right.

MS. HAZA TO JUDGE

I requested for her to get closer to the interpreter, Your Honor, thank you.

JUDGE TO MS. SILVA

Q.  Now, your name is Luz Marina Silva?

A.  Yes.

Q.  You are Colombian?  You have to use your voice, ma'am.

A.  Yes.

Q.  How old are you?

A.  I'm 48.

Q.  Are you married or single?

A.  Single.

Q.  Do you have any children?

A.  No.

Q.  Now, when did you come to the United States?

A.  The last time I came into the United States was March

000269




8, 2000.

Q. Had you been to the United States previous to that?

A. Yes.

Q. How many times?

A. Twice.

Q. When was the first time?

A. June 10, '99.

Q. Why did you come here on June 10, '99?

A. As a tourist.

Q. How long did you stay?

A. One month.

Q. Then you went back to Colombia?

A. Um-hum, yes.

Q. And when did you come back?

A. November 21, '99.

Q. What was the purpose of that visit?

A. Because I had an attempt in Colombia from the FARC (phonetic sp.).

Q. So why did you come here?

A. Because if I had stayed in my country probably something would have happened to me, and it was the easiest and fastest way to come to this country.

Q. Did you come with a tourist visa?

A. Yes.

Q. How long did you stay?

000270

 

A.   A little over a month.

Q.   Who did you stay with when you came that time?

A.   The second time?

Q.   Yes.

A.   I was in an apartment in Miami Beach.

Q.   Did you rent the apartment?

A.   Yes.

Q.   So why did you only stay a month and a half if you had had a problem in Colombia?

A.   Well I started watching off already that things had already been over with, I have spent Christmas and New Year's here, I felt anguish. I had an aunt back in Balta who was gravely ill and I thought enough time had elapsed and that I could go back, that things might be different.

Q.   And where did you live in Colombia, Balta?

A.   Yes.

Q.   How long had you lived in Balta?

A.   My whole life.

Q.   Did you belong to any, any groups or organizations in Colombia?

A.   Yes, always.

Q.   What?

A.   Yes, I belonged to the conservative group. My family had always belonged to the conservative group, and lately I was working with Antanna Mockus.

000271

 

Q. Who is Antanna Mockus?

A. At this moment he is the mayor of the city of Bogota.

Q. What do you mean you worked for him?

A. For his party, visionary party. I did politics for him.

Q. Since when did you do politics for him?

A. More or less since '94.

Q. How long has he been the mayor of Bogota?

A. At this moment two years.

Q. Was he running for mayor in '94?

A. Yes.

Q. Did he win?

A. Yes, he won in '95.

Q. So how long has he been the mayor of Bogota?

A. No, he was the mayor from '95 to '97, and then he resigned before '97 because he was running for the presidency of the republic.

Q. He ran for the presidency of Colombia?

A. Yes

Q. On behalf of what party?

A. Visionary.

Q. So were you a member of that party?

A. Yes.

Q. I thought you were a member of the conservative party?

A. Always.

000272

Q. Both then?

A. Yes, always but people who belong to the visionary party can be, can be from either party, the two stronger parties of Colombia, the liberal party and the conservative party. They can belong to the visionary party and be with both groups.

Q. So how many times has Mr. Mockus run for public office?

A. Twice for the mayor's office and one for the presidency.

Q. And did you help him out in all three of these campaigns?

A. Yes, always.

Q. What was your job in the campaign?

A. Well, organize the help brigade, talk to people so they would vote for the party, go to the headquarters and listen to the party's platform.

Q. Did you occupy any particular position with a title in any of the campaigns?

A. No, no.

Q. Were you in charge of people?

A. No. Only corporation.

Q. Did you speak publicly?

A. With the people around me to be in front of an audience using a microphone, no, but only the people around me.

Q. Did you have a paying job in Bogota?

A. A restaurant.

000273



Q. You owned a restaurant?

A. Yes.

Q. What was the name of the restaurant?

A. Tol Medrial Mebianta (phonetic sp.)

Q. Were you a sole owner?

A. Yes.

Q. And this restaurant is in Bogota?

A. Yes.

Q. When did you open it?

A. More or less around 1991.

Q. Okay. Is it still open?

A. Yes, my mother has it.

Q. Do you still own it?

A. Yes.

Q. Why did you come to the United States, why are you seeking asylum, ma'am?

A. Because I had an attempt against my life, the FARC tried to kill me before I came over here.

Q. That was before you came in November of '99?

A. Yes.

Q. When was this attempt, when?

A. It happened October 9, 1999.

Q. What happened?

A. I was leaving my restaurant, the restaurant is in my house, in my mother's house on the first floor.

A 79 344 105                    18                    December 13, 2002

000274

Q. Okay.

A. I was on my way to my apartment from the restaurant, two men arrived in a motorcycle, two people, and these people, these two men came close to my car and they shot into the car. The bullet did not hit me because it went in to the back window. And that is why I am here asking for political asylum.

Q. Who were these two people, do you know?

A. No.

Q. Why did they shoot you, shoot at you, do you know?

A. I have no idea but days before I was receiving -- they were calling me anonymous phone calls.

Q. Who was calling you?

A. Different people always. In one of the neighborhoods where we were doing the help brigade I received a condolence note.

Q. When did you receive a condolence note?

A. Around three weeks before the attempt.

Q. What did the note say?

A. Luz Marina Silva rest in peace for doing what she shouldn't be doing in the wrong place and the FARC signed it.

Q. Do you have that condolence letter?

A. No.

Q. Where is it?

A. I lost it, it disappeared. To tell you the truth I never thought that I was going to be the victim of an attempt.

000275

And one never things that.

Q. Okay, did you report this, any of these calls, the note or the shooting to the police?

A. No.

Q. Why not?

A. Because on the day of the attempt on that evening at 7 p.m., 7 in the evening, they called me at my apartment and they told me don't you dare even think about making a report. That is a well known fact in Colombia.

Q. Who called you?

A. One man.

Q. Identified?

A. No, no, never in any of them.

Q. So you were too scared to go to the police?

A. Yes.

Q. So what you did was you came to the United States the next month?

A. Yes, in November.

Q. Between that -- up to November of 1999 had you had any other problems?

A. No, no, no.

Q. So you returned to Bogota when, in January of 2000?

A. Yes.

Q. Okay, and did you have any further problems after you returned to Bogota?

000276

A.   Yes.

Q.   What happened?

A.   I began to receive once again telephone calls from the urban group.

Q.   Before the calls previous had been anonymous.  Were these calls identified?

A.   No.  The same way, anonymous.

Q.   What did they say?

A.   We missed already once, don't provoke us again.  We missed on the 9th, we are not going to miss a second time, we're going to kill you.  A very rude, very obscene.

Q.   Did you -- what did they mean, don't provoke us again?

A.   To provoke means -- not to provoke them means not to be there, if I had already come here not to return.

Q.   After you returned in January of 2000 how many threatening calls did you receive until you left two months later?

A.   They were always daily, all the time.

Q.   Always anonymous?

A.   Yes.

Q.   Aside from calls did you have any other problems during this time?

A.   No.

Q.   When was the last time that you were involved in politics?

000277

A. Before the attempt.

Q. That's a long -- that could be any time, when? When was the last time you participated?

A. A few days before the attempt in October, since I arrived, since I returned in the United States, August, September, October, more or less.

Q. Did anybody else working with you have problems?

A. No, none.

Q. You were the only one?

A. Yes, but what it is is that my family has always been involved in politics.

Q. So, so have many other families in Colombia. Why would you be singled out?

A. Well, I have a cousin, Alicia Alhanio Silva (phonetic sp.) and she's completely immersed in the visionary party, and I have always helped her. Currently she is the secretary for the mayor of office, for Mockus right now at this time. In one of the telephone calls, the anonymous telephone calls that I received I was told that my family had always exploited the Colombian people. And supposedly I was the one who suffered the attempt that the did this to me because it was easier to get to me than to get to members of my family that have bodyguards.

Q. How do you know all this, how do you know this? Is this something that you're speculating on, or how do you know this?

000278

A. That's why -- that's the way that they had to take revenge on my family. The one phone call they said, they said, during one of those phone calls is that this is a way that they found to take revenge on my family because they have bodyguards.

Q. Is that your family on your father's side or your mother's side?

A. My father's.

Q. When did this phone call explaining all this occur?

A. Before the attempt, they would say some things.

Q. This cousin of yours who is now the secretary of the mayor of Bogota, has she had any problems?

A. They have always received anonymous phone calls, always. In Bogota in the whole Colombia they are always calling and sending letters to terrorize people.

Q. So a lot of people get letters and phone calls?

A. Yes. If the person that's involved in some political group or is the first time doing something that they are not in -- that they don't want this person to do for whatever reasons.

Q. Apart from all that you stated today, did anything else happen to you in Colombia?

A. No.

Q. What do you think would happen to you if you went back to Colombia?

A. I'd be killed. They already warned me when I returned

000279



in January.

Q. Did you tell the police about these latest phone calls?

A. No.

Q. Why not?

A. Because that is just not done. People cannot go make a report in Colombia.

Q. Ma'am, the government of Colombia is in an all out war with the guerrillas. The president of Colombia, Mr. Orebet (phonetic sp.) apparently has a very effective campaign. Well, I -- I mean, how are they going to help if people don't file -- don't tell them what's happening?

A. Because when one is called on the phone and one is told do not make a report, do not do this, do not do that, one doesn't do it because people are afraid, people are afraid in Colombia.

Q. Anything else that you want to say?

A. No

JUDGE TO MS. SCHWARTZ

Ms. Schwartz?

MS. SCHWARTZ TO JUDGE

Yes, Your Honor, a few questions for her, thank you.

MS. SCHWARTZ TO MS. SILVA

Q. Ma'am, when did you buy your apartment in Miami Beach? Or when did you rent an apartment in Miami Beach?

A. I did not buy one. In November when I arrived. And also the first time that I came over. It's an apartment in a

000280

 

hotel. It's a room with a kitchen and bath.

Q. And how long was the lease for?

A. No, monthly.

Q. Okay, and at any time did anybody call you and ask you for money?

JUDGE TO MS. SCHWARTZ

In Colombia you mean?

MS. SCHWARTZ TO JUDGE

Q. In Colombia.

A. No.

Q. Did anybody ever call you in Colombia and ask you to collaborate with them?

A. No.

Q. Does your mother still live in her home above the restaurant?

A. Yes.

Q. And the restaurant is still open for business?

A. Yes.

Q. Is that a family restaurant?

A. I don't understand.

Q. Does your family run it?

A. My mother does. And my family is supported by the earnings of that restaurant, my siblings.

JUDGE TO MS. SILVA

Wait, your brothers, male brothers?

000281

MS. SILVA TO JUDGE

Four.

JUDGE TO MS. SCHWARTZ

Okay.

MS. SCHWARTZ TO MS. SILVA

Q. Do you all four of your brothers currently live in Colombia?

A. Yes.

Q. And do you have any sisters?

A. No.

Q. And your father, is he still in Colombia?

A. No.

Q. Where is your father?

A. He died.

JUDGE TO MS. SILVA

Q. What do your brothers do in Colombia?

A. Well, they don't do much, truly.

Q. What does that mean?

A. One doesn't work, the other one has a temporary job and they all live in my mother's house with her.

Q. Have they had any problems with the FARC or anybody?

A. No, none of them.

Q. Go -- I mean, if this was a family thing why wouldn't they come after your brothers?

A. They were not involved in politics.

000282

Q. You said that your whole family was perceived as being members of the conservative party and because you are part of that family they wanted to get you.

A. Yes.

Q. What about your brothers?

A. No, my brothers have never been involved in politics. When I say my family I meant uncles, cousins, my father's cousins. My father's side of the family. My brothers have never been involved in politics.

MS. SCHWARTZ TO JUDGE

I just have one or two more questions, Your Honor.

MS. SCHWARTZ TO MS. SILVA

Q. On the day of October 9, 1999 you were followed from your restaurant, correct?

A. Yes, I suppose.

Q. Okay, and has this, the restaurant or your mother's house ever been targeted by the FARC?

A. No, never.

MS. SCHWARTZ TO JUDGE

Okay, I have nothing further.

JUDGE TO MS. SILVA

Anything else that you want to say, ma'am?

MS. SILVA TO JUDGE

No.

JUDGE TO MS. SILVA

A 79 344 105                    27                    December 13, 2002

000283

Ma'am, I realize why you were nervous about living in Colombia but I can't find that you've been persecuted there. So I am going to deny your applications. Do you understand?

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

You will have the right to appeal that and I will explain to you how to do that appeal and will give you the papers that you'll need to fill out. Okay, understand?

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

Okay, now if I deny your applications you have the right to designate the country where you want to be sent. You don't have to designate a country. If you don't do it I will do it for you. Do you wish to designate a country?

MS. SILVA TO JUDGE

No, I don't know.

JUDGE RENDERS ORAL DECISION

JUDGE TO MS. SILVA

Okay, the Court will designate Colombia. Ma'am as I've told you I've denied your application for asylum because, you know, other than the general conditions of instability and violence in Colombia I don't see that you are in any worse position than anybody else in that country. Do you understand?

000284

MS. SILVA TO JUDGE

Um-hum.

JUDGE TO MS. SILVA

I may be mistaken and you have a right to appeal my decision to the Board of Immigration Appeals in Falls Church, Virginia. If you do apply that appeal it must be filed within 30 days directly with the Board, that is on or before January 13, 2003. Do you understand?

MS. SILVA TO JUDGE

Um-hum.

JUDGE TO MS. SILVA

Now, you have -- is that a yes?

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

Now, I'm going to give you the appeal form that you have to fill out and file. That appeal has to be filed, as I said, with, with the payment of the appeal fee. And if you don't have money to pay that fee then you have to file for a fee waiver form, which I am also giving to you at this time. Do you understand? Do you understand?

MS. SILVA TO JUDGE

Um-hum.

JUDGE TO MS. SILVA

Yes?

000285

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

Okay. Now, that appeal has to be received either with the fee or with a fee waiver on or before January 13, 2003. If you file the appeal without the waiver or the fee then it will be as if you haven't filed it and my order will become final. Do you understand?

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

Now, you'll continue to have the right to have an attorney help you out in this case including the preparation and filing of this appeal. If you don't have money to pay for an attorney I will again provide you with a list of attorneys who can represent you at little or no charge. Do you understand?

MS. SILVA TO JUDGE

Um-hum, thank you.

JUDGE TO MS. SILVA

Okay. Remember that it is very important that you file your appeal with a fee or with a fee waiver on or before January 13, 2003. If you do not I will warn you again that my order will become final. Do you understand?

MS. SILVA TO JUDGE

Yes.

000286



JUDGE TO MS. SILVA

And if you don't file it then my order becomes final.

MS. SILVA TO JUDGE

Yes.

JUDGE TO MS. SILVA

Do you have any questions, ma'am?

MS. SILVA TO JUDGE

No.

JUDGE TO MS. SILVA

Okay, good luck, ma'am, if you decide to file that appeal.

JUDGE TO MS. SCHWARTZ

And Ms. Schwartz, do you, the Government, waives appeal?

MS. SCHWARTZ TO JUDGE

Yes, Your Honor.

JUDGE FOR THE RECORD

Case closed.

<u>HEARING CLOSED</u>

A 79 344 105                    31                    December 13, 2002

000287

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
Miami, Florida

File No.:  A 79 344 105                           December 13, 2002

In the Matter of                    )
                                    )
LUZ MARINA SILVA                    )      IN REMOVAL PROCEEDINGS
                                    )
                                    )
            Respondent              )

CHARGE:        Section 237(a)(1)(B).


APPLICATIONS:  Asylum, withholding of removal, and relief under
               the Torture Convention.


ON BEHALF OF RESPONDENT:            ON BEHALF OF SERVICE:

Pro se                              Gail Schwartz, Esquire
                                    Assistant District Counsel




ORAL DECISION OF THE IMMIGRATION JUDGE

The respondent is a 48-year-old native and citizen of Colombia who was admitted to the United States on or about March 8, 2000 as a visitor for pleasure, and who remained in the United States beyond the date authorized by the Immigration and Naturalization Service (hereinafter the Service).

In a previous hearing before this Court the respondent, under oath, admitted to the factual allegations in the Notice to Appear. Based on her admissions, the Court finds that she is removable as charged under Section 237(a)(1)(B) of the

1

FEB 20 2003

APPENDIX C

Immigration and Nationality Act as having remained in the United States for a time longer than permitted. Removability, in fact, has been established by clear and convincing evidence through her sworn testimony. The Court will turn to the application for asylum, withholding of removal, and relief under the Torture Convention, which are the only issues remaining in the case.

The record before me contains the <u>Country Reports</u> and the <u>Profile of Asylum Claims and Country Conditions</u> prepared by the United States Department of State for the country of Colombia, which advised as to conditions in that country as of the date that it was issued.

The Attorney General's regulations concerning asylum and withholding of removal pursuant to Sections 208 and 241(b)(3) of the Act are applicable to this case. Regarding withholding of removal under Section 241(b)(3), an applicant must meet the burden of proof set forth at 8 C.F.R. Section 208.16. The alien has to establish that her life or freedom would be threatened in the proposed country of removal because of her race, religion, nationality, membership in a particular social group or political opinion. Her life or freedom shall be found to be threatened if it is more likely than not that she will be persecuted because of one of these five enumerated grounds.

To establish eligibility for asylum, the applicant must meet the burden of proof prescribed in 8 C.F.R. Section 208.13. Said regulation states that the applicant has to establish eligibility

000244

as a refugee as defined in Section 101(a)(42)(A) of the Act. Her testimony, if credible in light of the general conditions in her country of nationality, may be sufficient to sustain a burden of proof without further corroboration.

An applicant shall be found to be a refugee because of past persecution if she can establish that she has suffered past persecution because of one of the five previously enumerated grounds, and that she is unable or unwilling to return to or avail herself of the protection of the country where she suffered such persecution because of that persecution.

An applicant shall be found to have a well-founded fear of future persecution if she can establish, first, that she has a fear of persecution in her country because of one of the five previously enumerated grounds, second, that there is a reasonable possibility of actually suffering some persecution if she were to return there, and, third, that she is unable or unwilling to return to or avail herself of the protection of her country because of such fear.

In evaluating whether the applicant has sustained her burden of proof the Immigration Judge shall not require her to provide evidence that she will be singled out individually for persecution if the applicant establishes that there is a pattern or a practice in her country of nationality of persecution or groups of persons similarly situated as the applicant because of one of the five previously enumerated grounds, and the applicant

000245

also establishes his inconclusion and identification with such groups of persons such that her fear of persecution upon return is reasonable.

This is a similar burden to that prescribed by the Board of Immigration Appeals in the Matter of Mogharrabi, 19 I&N Dec. 439 (BIA 1987) where the Board stated that an asylum applicant's persecution claim must be plausible, detailed and coherent. The alien's own testimony may, in some cases, be the only evidence available and can suffice that the testimony is believable, consistent and sufficiently detailed to provide a plausible and coherent account of the basis for her fear.

An applicant shall also be considered for eligibility for withholding of removal under the Torture Convention if she requests such consideration or if the evidence presented indicates that she will be tortured in the country of removal. See 8 C.F.R. Section 208.13(c)(1).

Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person. See 8 C.F.R. Section 208.18(a)(1). The severe pain or suffering must be inflicted on the applicant or a third person for one of four purposes, specifically, one, for obtaining information or a confession, two, for punishing for an act committed or suspected of having been committed, three, for intimidation or coercion, or, four, for any reason based on discrimination of any kind. In addition, in order to constitute

000246

torture, the act must be directed against a person in the offender's custody or physical control. See 8 C.F.R. Section 208.18(a)(6). Further, the pain or suffering must be inflicted by or in the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. See 8 C.F.R. Section 208.18(b)(1).

The applicant for withholding of removal under the Torture Convention bears the burden of proving that it is more likely than not that she will be tortured if removed to the proposed country of removal. See 8 C.F.R. Section 208.16(b).

The respondent testified today in support of her applications for relief. She indicates that she and her whole family have always been a member of the conservative party in Colombia and that she has lived her entire life in Bogota, Colombia where she owns a restaurant, which is still operating, and is at this time being run by the respondent's mother. She testified that she was involved in politics as a supporter of the present mayor of Bogota, Mr. Antanna Mockus. She first participated in support of Mr. Mockus' candidacy for the mayor in 1994. Mr. Mockus won that election and was the mayor until he resigned to participate as a candidate for the presidency in 1997. The respondent also worked at that candidacy which was unsuccessful. The respondent then worked for Mr. Mockus' second go at the mayoralty of Bogota. He won this campaign and is, as she stated, the actual mayor of Bogota, Colombia.

000247



The respondent did not hold any official position in Mr. Mockus' campaign or in the party nor did she speak publicly in support of Mr. Mockus for any political party. She helped in organizing the help brigades, and, talking to people, and other general work for the party and the candidacy. As stated, she was not a leader nor did she occupy just any particular position.

The respondent states that she has problems in Colombia because of her involvement in politics and also because her entire family was known to be supporting of the conservative party. She states that she started having problems towards the end of 1999. She indicates that she received several threatening calls, anonymous, indicating that she should stop what she was doing and that on October 9th of 1999 as she was leaving her restaurant and on her way to her apartment in her car, two men came along side in a motorcycle and fired shots at her car. She does not know who these men were but police said they were members of FARC because of the calls that she had been receiving. She had also received a condolence note about three weeks previous to the shooting announcing sympathy with her own passing and saying that she had been in the wrong place at the wrong time and allegedly signed by a guerrila group known as the FARC. The Court asked her if she had this note and she indicates that she has lost it. She did not report any of the calls, the receipt of the card, nor the attempt on her life to the authorities in Colombia because she was told not to do so and it is dangerous to

A 79 344 105                    6                    December 13, 2002

000248

report these incidences to the police according to the respondent. Nevertheless, the respondent decided to leave Bogota and come to the United States which she did on November 21, 1999 as a tourist. She had previously been here on June 10, 1999, also as a tourist and remained for one month. The respondent, when she came in November of 1999 stayed for a little over a month before returning to Bogota hoping that things were better. She did not indicate that she had requested any help from the government of the United States when she came here in November 21st of 1999 or indicated to anybody that she had problems in Colombia. The respondent returned to Colombia in January of 2000 and remained there for another two months before coming to the United States the last time on March 8, 2000. She has remained here since then.

The respondent indicates that after she returned to Colombia in November of 2000 hoping that things would be different, she started receiving daily anonymous calls telling her that she should not provoke the caller and that she would be killed. Again she did not report these calls to the authorities but decided to leave Colombia and come to the United States as stated in March of 2000.

The respondent's mother remains in Colombia running her restaurant and she has four brothers who also remain in that country and are supported by the same restaurant and live with the respondent's mother. Nothing has happened to any of these

A 79 344 105                          7                    December 13, 2002

000249



family members nor have there been any attempts on the respondent's business nor any other reported problems. The respondent further states that she has a cousin who was even more active than her in support of the mayor of Bogota, Mr. Mockus, and that she is actually the secretary. She indicates that this cousin has also received threatening calls and in fact states that many people in Colombia received threatening calls and letters and this was a common way of terrorizing the people.

The only incident that respondent referred to which could qualify as past persecution would be the shooting of October 9th of 1999 and the respondent indicates that she does not know who shot her nor has in any other way identified who or why she was shot except for explaining that she had received anonymous calls and a condolence note. The respondent, although she may have been active in support of political candidacy of the actual mayor of Bogota, was in fact not in any leadership role in politics nor has she explained any other reason why she will be singled out other than saying that her whole family was a member of the conservative party and that she was being made an example. She speculates that nobody else has been harmed in her family because everybody has bodyguards. However, she indicates that her four brothers live in Bogota and they have had no problems.

Although the Court recognizes that conditions in Colombia are in fact violent, everybody in Colombia suffers under these general conditions of violence and criminal activity. The

A 79 344 105                    8                    December 13, 2002

000250



respondent has not supplied any evidence to show that she was either persecuted in the past nor that she has a well-founded fear of being persecuted in the future for any of the five previously enumerated grounds. Additionally, she always lived in Bogota has not explained why she could not have lived in another part of Colombia if she in fact felt threatened in the city of Bogota. In addition, she never, if she felt that she was in danger in Colombia, gave the authorities the opportunity to help or protect her. The Court finds that the respondent therefore failed to show that she qualifies for the relief that she seeks. The Court will deny her application for asylum as well as her application for withholding of removal which requires a higher standard of proof. The Court further finds that the respondent has failed to show that there is any likelihood of possibility that she will be tortured if she returns to Colombia as that in turn has been previously defined. The following orders will be issued.

ORDER

IT IS HEREBY ORDERED that the applications for asylum and withholding of removal be denied.

IT IS FURTHER ORDERED that relief under the Torture Convention be denied.

A 79 344 105                    9                    December 13, 2002

000251



IT IS FURTHER ORDERED that respondent be removed and deported to Colombia.

_____
PEDRO A. MIRANDA
U.S. Immigration Judge

000252



## CERTIFICATE PAGE

    I hereby certify that the attached proceeding before JUDGE PEDRO MIRANDA, in the matter of:

LUZ MARINA SILVA

A 79 344 105

Miami, Florida

is an accurate, verbatim transcript of the cassette tape as provided by the Executive Office for Immigration Review and that this is the original transcript thereof for the file of the Executive Office for Immigration Review.


_Elizabeth M. Cochran /ST_
Elizabeth M. Cochran, Transcriber

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, Maryland  21401
(301) 261-1902


March 1, 2003
(completion date)


By submission of this CERTIFICATE PAGE, the Contractor certifies that a Sony BEC/T-147, 4-channel transcriber or equivalent, as described in Section C, paragraph C.3.3.2 of the contract, was used to transcribe the Record of Proceeding shown in the above paragraph.